UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-40259-FDS

ANDRE MITCHELL and )
DOROTHY MITCHELL, )
    Plaintiffs )
 )
vs. )
 )
OFFICER AARON KENNEDY, OFFICER )
ROBERT QUIRK, OFFICER DAVID )
SPADAFORE, SERGEANT MARK AMICO, )
SERGEANT DENNIS SURRETTE and the )
TOWN OF LEOMINSTER, )
    Defendants )

## DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

NOW COME the defendants and respectfully move this Court to compel the plaintiff to produce documents and/or information in compliance with Rule 26 of both the Federal Rules of Civil Procedure and Local Rules and/or be precluded from submitting evidence on certain matters at the time of trial. As grounds therefor and in support thereof, the defendants state as follows.

**A.**     **As to Witness Statements.**

The plaintiff, in Automatic Disclosure, identified nine individuals as persons likely having discoverable information in connection with the above-captioned matter. The plaintiff failed, however, to provide addresses or other means of communicating with the individuals. The plaintiff also failed to state with specificity the summary of the information each was likely to possess.

424219

At the deposition of the plaintiff, Andre Mitchell, it was, for the first time, determined that each of the individuals also provided written statements to the plaintiff. Those statements were neither identified nor provided in the initial disclosure or any subsequent document production. At the deposition, plaintiff's counsel agreed to the production of these statements. These statements were finally produced, after further inquiry from the defendants' counsel, on or about January 10, 2006. See Exhibit A hereto. The plaintiff refused to produce the statement of Mr. Mitchell and, further, failed to mention that the plaintiff, Dorothy Mitchell, had also prepared such a statement.

Thereafter, the defendants undertook efforts to locate the individuals so as to notice their depositions. Counsel wrote on February 13, 2006 again requesting that counsel provide current addresses of the witnesses who provided the statements. See Exhibit B hereto. Counsel for the plaintiff expressed a willingness to provide such addresses and, in fact, confirmed the same in writing by way of correspondence dated March 27, 2006. See Exhibit C hereto. To date, the information has not been produced.

Based upon the foregoing, the defendants respectfully submit that the plaintiff should be ordered to produce the additional information with regard to the witnesses and/or be precluded from submitting their testimony at trial. The defendants submit that Rule 37(c)(1) mandates the same. That rule states:

> (c)     Failure to Disclose; False or Misleading Disclosure; Refusal to Admit.
>
> (1)    A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized

424219

>under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule and may include informing the jury of the failure to make the disclosure.

Fed. R. Civ. P. 37(c)(1).

**B.   As to Statement of the Plaintiffs.**

Additionally, the defendants submit that the plaintiff, Dorothy Mitchell, was deposed on March 28, 2006. At that time, she had in front of her a statement which appeared to be consistent with the statements produced from the other witnesses. That statement was neither identified nor produced in Automatic Disclosure or subsequent communication from counsel. At the deposition, the plaintiff's counsel agreed to produce the statement but, to date, the same has not been produced. See Deposition testimony of Dorothy Mitchell, a portion of which is attached hereto and marked as Exhibit D.

Despite the foregoing, by way of correspondence dated April 18, 2006, a copy of which is attached hereto and marked as Exhibit E, the plaintiffs asserted the attorney-client privilege as to the statements written by the plaintiffs. The defendants submit that such an assertion is inappropriate as the testimony of the plaintiff, Dorothy Mitchell, renders it clear that the statements were taken, not for or at the direction of counsel, but, rather, at the suggestion of Ms. Mitchell herself. See Exhibit D.

The law is clear in this Circuit that, in order to assert the attorney-client privilege, a party must show that he was or sought to be a client of the attorney, that the attorney was acting as such in connection with the matter at issue, that the matter as to which the privilege is being asserted relates to facts communicated for the purpose of the securing of legal advice or a legal opinion and that the privilege has not been waived. The privilege cannot be asserted if any one of the elements is missing. *U.S. v. Wilson,* 798 F.2d 509, 511-513 (1st Cir. 1986).

424219

It is clear from the deposition testimony of Mrs. Mitchell that the plaintiff cannot meet any one of the four required conditions to assert the privilege. Because of the complete absence of a basis for the assertion of the privilege necessitating the instant motion, the defendants also request that this Court sanction the plaintiffs by ordering the payment of the fees incurred by the defendants in preparation of the instant motion.

**C.    As to Medical Records.**

Finally, it became apparent from documents produced as well as the testimony of the plaintiff, Andre Mitchell, at his deposition that all medical records relating to his alleged damages had not been produced. Again, that issue was acknowledged by plaintiff's counsel by way of correspondence dated January 10, 2006, Exhibit A. On or about March 23, 2006, the plaintiff forwarded medical records which essentially duplicated those previously produced with one minor exception. The records relating to the newly identified alleged injury, that being depression and/or headaches for which he claims to have been treated with medication as well as therapy, to date, have not been produced. The same is true with respect to the plaintiff, Dorothy Mitchell.[1]

Based upon the foregoing, the defendants respectfully submit that the plaintiff should be precluded from submitting medical evidence other than that produced and/or should be ordered to produce the medical records requested and/or provide authorizations and the identity of the health care professionals with whom he treated so as to allow for the defendants to subpoena the subject records at the expense of the plaintiffs.

---

[1] The plaintiff agreed at deposition to produce additional records which have yet to be produced. See Deposition of Dorothy Mitchell, a portion of which is attached hereto and marked as Exhibit D.

424219

WHEREFORE, based upon the foregoing, the defendants respectfully request that the plaintiffs be compelled to produce the information as requested above and for such other and further relief as this Court deems just and proper, including but not limited to an order that the plaintiff pay the fees incurred by the defendants necessitated by the pursuit of the instant motion.

        THE DEFENDANTS
OFFICER AARON KENNEDY,
OFFICER ROBERT QUIRK,
OFFICER DAVID SPADAFORE,
SERGEANT MARK AMICO,
SERGEANT DENNIS SURRETTE and the
TOWN OF LEOMINSTER

By  /s/ *Nancy Frankel Pelletier*
Nancy Frankel Pelletier, Esq., of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301  Fax (413) 785-4658
BBO No.: 544402
npelletier@robinson-donovan.com

CERTIFICATE OF CONSULTATION

The undersigned states, in accordance with Rule 7.1 of the Local Rules of the United States District Court that an effort was made to resolve this matter.

    /s/ *Nancy Frankel Pelletier*
Nancy Frankel Pelletier, Esq.

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 20th day of June, 2006.

    /s/ *Nancy Frankel Pelletier*
Nancy Frankel Pelletier, Esq.

424219

# HRONES, GARRITY & HEDGES LLP
### COUNSELORS AT LAW
LEWIS WHARF - BAY 232
BOSTON, MASSACHUSETTS 02110-3927

STEPHEN HRONES
JESSICA D. HEDGES

MICHAEL L. TUMPOSKY

TELEPHONE (617) 227-4019
FACSIMILE (617) 227-3908
E-MAIL sbhlaw@comcast.net
E-MAIL hrones@masscriminallawyer.com
WEBSITE www.masscriminallawyer.com

PAUL J. GARRITY
(ALSO MEMBER OF NEW HAMPSHIRE BAR)

NEW HAMPSHIRE OFFICE:

14 LONDONDERRY ROAD
LONDONDERRY, NEW HAMPSHIRE 03053
TELEPHONE (603) 434-4106
FACSIMILE (603) 437-6714



January 10, 2006

Nancy Frankel Pelletier
Robinson Donovan
1500 Main Street, Suite 1600
Springfield, MA 01115

Re: *Mitchell et al. v. Kennedy et al, C.A. No. 04-40259-FDS*

Dear Ms. Frankel Pelletier:

    Enclosed are several witness statements and a receipt from the Leominster District Court. Please note that Mr. Mitchell also provided us with a similar witness statement which I consider to be privileged.

    I will forward his medical records as soon as they are in my possession

Sincerely,

Michael Tumposky



FILE COPY

Nancy Frankel Pelletier, Esq.

(413) 732-2301 ext. 142
npelletier@robinson-donovan.com

February 13, 2006

Michael Tumposky, Esq.
Hrones Garrity & Hedges, LLP
Lewis Wharf – Bay 232
Boston, MA 02110

    RE: Andre Mitchell v. Officer Aaron Kennedy, et al
         Civil Action No.: 04-40259-FDS

Dear Mr. Tumposky:

    After reviewing your Automatic Disclosure which you forwarded to me, I note that there are no current addresses listed for the witnesses that were present when the incident allegedly occurred. Would you please provide me with the current addresses of the following witnesses:

    Tayla Gonzalez
    Joseph Hines
    Jaleia Stevenson
    Sean Mitchell
    Dana Winters
    Omar Mitchell

    Should you have any questions, please do not hesitate to contact me.

                                      Sincerely,

                                      Nancy Frankel Pelletier

NFP:stk
Enclosure
cc: Maureen MacDonald *email*
9129/50122

420031

ROBINSON DONOVAN, P.C.
MAIN OFFICE: 1500 Main Street, Suite 1600 • Post Office Box 15609 • Springfield, MA 01115-5609 • 413-732-2301 • Fax: 413-785-4658
Northampton Office: 16 Armory Street • Northampton, MA 01060 • 413-587-9853
www.robinson-donovan.com

# HRONES, GARRITY & HEDGES LLP
### COUNSELORS AT LAW
LEWIS WHARF - BAY 232
BOSTON, MASSACHUSETTS 02110-3927

STEPHEN HRONES
JESSICA D. HEDGES

MICHAEL L. TUMPOSKY

TELEPHONE (617) 227-4019
FACSIMILE (617) 227-3908
E-MAIL sbhlaw@comcast.net
E-MAIL hrones@masscriminallawyer.com
WEBSITE www.masscriminallawyer.com

PAUL J. GARRITY
(ALSO MEMBER OF NEW HAMPSHIRE BAR)

NEW HAMPSHIRE OFFICE.

14 LONDONDERRY ROAD
LONDONDERRY, NEW HAMPSHIRE 03053
TELEPHONE (603) 434-4106
FACSIMILE (603) 437-6472

EXHIBIT

March 27, 2006

**By facsimile only to:**
Nancy Frankel Pelletier
Robinson Donovan, P.C.
Fax: (413) 785-4658

*Re: Mitchell v. Kennedy, Docket No. 04-40259*

Dear Ms. Frankel Pelletier:

I am writing to confirm that the deposition will take place tomorrow, March 28 2006, in your office as scheduled. Please be advised that Jessica D. Hedges will be defending in my place.

Also, Ms. Mitchell has informed me that she will bring the addresses you requested, to the extent they are known by her. Unfortunately, she has not yet been able to obtain her medical records. Although her medical injuries are a minor portion of our case, by rule you are entitled to them. Therefore, if questions later arise regarding these records, we will of course allow you to reopen her deposition or, in the alternative, we will respond to any written interrogatories you wish to propound.

Thank you for your cooperation in this matter.

Sincerely,

Michael Tumposky

```
 1  that you were trying to pursue?
 2      A.   The violation of my civil rights, the
 3  violation of my grandchildren, the violation of my
 4  grandson who was hurt. It didn't need to be like that.
 5      Q.   Your grandchild's mother or father has not
 6  brought any claim against any officers, is that correct?
 7           MS. HEDGES: Answer the question.
 8      A.   Yes, she did, she tried.
 9      Q.   She tried?
10      A.   Uh-huh.
11      Q.   What happened?
12      A.   We didn't have no legal anything for
13  anything. No legal complaint in the above matter, I
14  thought I just read that piece, that one line paper to
15  you.
16      Q.   She tried to bring a criminal action?
17      A.   Yes.
18      Q.   The same thing you did?
19      A.   Oh, yes.
20      Q.   But you are now here on a civil action,
21  correct?
22      A.   Yes.
23      Q.   And your son Andre is here on a civil action,
24  correct?
```

Page 94

```
 1      A.   (Witness Nods.)
 2      Q.   It's yes for the record?
 3      A.   Yes.
 4      Q.   Nobody's pursued any action on behalf of your
 5  grandchild to your knowledge?
 6      A.   Because I thought I could do that for him and
 7  I'm not sure because --
 8           MS. HEDGES: All right.
 9      A.   -- I thought he would be included with us
10  because he got injured. He showed physical bruises, we
11  don't.
12           MS. HEDGES: Just answer the questions, just
13  answer, okay?
14      A.   Okay.
15      Q.   Have you ever had any discussions with his
16  mother about pursuing an action on his behalf?
17      A.   Any discretions?
18      Q.   Discussions?
19      A.   Discussions, we talked about it.
20      Q.   What did you say and what did she say?
21      A.   She thought I could file it for him because
22  he was in my house at that time. That's the way we were
23  thinking, so now we don't know. Maybe --
24           MS. HEDGES: You answered it.
```

Page 95

```
 1      Q.   When was the last time you had any
 2  conversation with her about pursuing any claim on behalf
 3  of your grandson?
 4      A.   I talk to her every week.
 5      Q.   And every week do you talk about whether or
 6  not to pursue a claim on behalf of your grandson?
 7      A.   No.
 8      Q.   My question was when was the last time you
 9  had any conversation with her about whether or not to
10  pursue a claim on behalf of your grandson?
11      A.   Maybe about a month ago.
12      Q.   You tell me what you said and what she said.
13      A.   I said to her, I'm not sure if I can file
14  for, I can do anything for Twon but I think you need to
15  get ahold of the lawyer.
16      Q.   What did she say?
17      A.   I will do that.
18      Q.   To your knowledge has she done that?
19      A.   I don't know.
20      Q.   What prompted this conversation a month ago
21  when this incident happened in May of 2002?
22      A.   Because Dre had just started his deposition.
23  When he first started the deposition, I think that's when
24  we started talking more about it and I started saying to
```

Page 96

```
 1  her, I don't know if we can push forward for Twon. I
 2  don't know if you have to file something yourself, but
 3  we'll still try to push forward for him, for you for him;
 4  but if I find that I can't do that, you need to file.
 5  Those were the words.
 6      Q.   In January of 2006, your counsel provided me
 7  with statements of seven people who were allegedly present
 8  on the night of, on the day of this incident. Have you
 9  seen those statements?
10      A.   Yes.
11      Q.   Under what circumstances were those
12  statements taken, typed?
13      A.   Under what circumstances? Well, I know we
14  just wanted to make sure, I don't know, everybody had, I
15  don't know that. We had statements on everybody. We just
16  wanted to make sure we had everybody's statement.
17      Q.   How did it come about that these statements
18  got put on a piece of paper?
19      A.   I suggested that everybody give a statement.
20      Q.   When did you suggest that?
21      A.   That happened like the very next, like that
22  happened on the 17th. I think it was a Saturday, but
23  probably a Monday that following week.
24      Q.   Did you call everybody and ask them to come
```

97

```
1   over or how is it that these various people that didn't
2   live there --
3       A.    I asked people to write on their paper, on a
4   piece of paper what they felt happened in the house that
5   night.
6       Q.    Okay, so some time around Monday you started
7   calling people and asking them to write out what they saw?
8       A.    No, right after that that week, okay, I don't
9   have to call them, people were there a lot because of
10  Virginia, these are her friends; and I would, I just said,
11  you know, maybe we need to get notarized statements of
12  what actually happened in this house because we need to
13  have everything in one place, everything together because
14  I didn't really know what was going to happen with Dre in
15  that case.
16      Q.    Did these individuals handwrite something?
17      A.    Well, at first they did, yes.
18      Q.    And then what happened to those handwritten
19  documents?
20      A.    They were destroyed.
21      Q.    Who destroyed them?
22      A.    The person destroyed it after they gave their
23  statement because we had another person actually putting
24  everything on something for us.
```

98

```
1       Q.    Okay, so first these individuals wrote
2   something out in handwriting?
3       A.    Uh-huh.
4       Q.    Correct?
5       A.    Uh-huh.
6       Q.    Yes, for the record?
7       A.    Yes.
8       Q.    And then what happened after that?
9       A.    They gave statements, they gave a statement.
10      Q.    To who?
11      A.    They were typed to the girl who was doing
12  this for us.
13      Q.    Who was that?
14      A.    A friend of ours.
15      Q.    What's her name?
16      A.    Her name is Sarah Edmonds.
17      Q.    Sarah Edmonds? Did Sarah Edmonds sit down
18  with each of these individuals?
19      A.    Yes, she did.
20            MS. PELLETIER: Counselor, she's also not
21  been identified on my disclosure and I ask that she
22  immediately be identified with an address.
23      Q.    Do you know where she lives?
24      A.    She moved out of state.
```

99

```
1       Q.    When?
2       A.    At least two years ago, I have not heard from
3   her.
4       Q.    How is it that you picked Sarah Edmonds to
5   come take these statements?
6       A.    She was a friend of mine.
7       Q.    But did she have some particular
8   skill that --
9       A.    Yes, she did.
10      Q.    What was her skill?
11      A.    She was just good at typing. She knew the
12  computer. I, I didn't know the computer like that.
13      Q.    Did she take the pieces of paper that had the
14  handwriting on them --
15      A.    No, the person destroyed that piece of paper,
16  not her.
17      Q.    No, no, no, you need to wait till I finish
18  the question. Did she take the piece of paper that had
19  the handwriting on it and go to the computer and type out
20  what has been produced in this case?
21      A.    No.
22      Q.    What happened?
23      A.    She would sit with the person and the person
24  would tell her what happened and she would generate those
```

100

```
1   statements.
2       Q.    Were these generated on your computer at your
3   home?
4       A.    No.
5       Q.    Where were they generated?
6       A.    On another computer and I think she got rid
7   of that computer, too. It was an old computer, very slow
8   moving.
9       Q.    Where was it?
10      A.    It was in her home.
11      Q.    So each of these people went to her home?
12      A.    Yes.
13      Q.    Were you there?
14      A.    No, on some occasions, yes, but not all.
15            MS. PELLETIER: Will you mark that, please?
16            (Exhibit No. 2 marked.)
17      Q.    We've just marked as Exhibit 2 the documents
18  which were produced to me on January 10, 2006 and they
19  contain some typewritten statements. Are these the
20  statements you've been talking about that were created by
21  Sarah Edmonds?
22      A.    I don't know if these are the statements. I
23  didn't see all, I didn't see these statements. I didn't
24  see them all. Could I see? Could I just look at this one
```

### Page 101

a minute? I believe this is Dana Winters, yes.

Q. You just referred to a handwritten statement, correct?

A. That's Dana Winters, yes.

Q. The rest of the statements are typewritten?

A. That's right.

Q. Are these the statements that you are talking about?

A. They look like it.

Q. Did you give a statement as well?

A. Yes, I did.

Q. Where is that statement?

A. I don't know why nobody has my statement. I have my statement.

MS. HEDGES: We can give you a copy. I think it was inadvertently --

A. I'm just looking to see if you got everybody. This is one, two, three, four, five, six. Looking at this you don't have Andre's statement. You don't have my statement, okay.

Q. So for the record you just reviewed the statements that were produced on January 10 and indicated that we are missing your statement and Andre's statement, is that fair to say?

### Page 102

A. I think so, yes, it looks like that.

MS. PELLETIER: Counsel, I'm going to ask that those documents be produced?

MS. HEDGES: Okay.

Q. Having reviewed these statements, the typewritten statements that were part of Exhibit 2, again are those the statements that you claim were transcribed by Sarah Edmonds?

A. I can't honestly say those are the statements because I didn't, I wasn't there, but they look like the statements.

Q. Did you get copies of all the statements?

A. I did.

Q. Do you still have copies of the statements?

A. I don't think so. I gave them to Dre to give the lawyer. I just have mine. I might have his but I'm not sure. I'm going to look.

Q. All right.

A. Because that basically is Dre trying to keep stuff on me.

Q. Having reviewed these, do you believe there are other statements other than yours and Andre's that are missing?

A. I do not, no.

### Page 103

Q. Do you know when these statements were taken? They are not dated.

A. I said like the first week after this happened sometime in the beginning of the week. It was like that week.

Q. How do you know that each individual destroyed their handwritten notes?

A. Because she had told them that's what they should do. She didn't want to destroy nothing. She said, You need to destroy these, and I assume that's what they did.

Q. Why did they need to destroy them?

A. Why not? She had it here what they were saying. I guess that's how she looked at it. She already had whatever they had to say, I don't know.

Q. Do you have the present addresses and/or phone numbers for the individuals that you claim witnessed the events of May 17 of 2002?

A. Some of them, most of them.

Q. Did you provide that information to counsel?

A. Not yet.

Q. You haven't done it yet?

A. No.

Q. Why not?

### Page 104

A. Because I was asked to bring them with me today.

Q. Other than the emergency department records, what if any documents do you have that you claim reflect any damages that you claim you suffered as a result of any of the incidents of May 17, 2002?

A. None.

Q. Do you understand that there is a series of photographs produced by your counsel in this case?

A. Yes, I do.

Q. What is the purpose of the photographs?

A. I would think to show the bruise on the little boy's head.

Q. Aside from the photograph of the little boy, what was the purpose of the rest of the photographs?

A. To show how the house sit and I would think for the destruction to my screen door.

Q. Who destroyed your screen door?

A. Officer Kennedy kicked it in, he broke my lock. I don't even think he kicked that door. He snatched it, you know, because it's a screen, then it's another door; so he snatched the screen door and he broke it.

Q. When did that happen, do you know?

# HRONES, GARRITY & HEDGES LLP
COUNSELORS AT LAW
LEWIS WHARF - BAY 232
BOSTON, MASSACHUSETTS 02110-3927

TELEPHONE (617) 227-4019
FACSIMILE (617) 227-3908
E-MAIL shhlaw@comcast.net
E-MAIL hrones@masscriminallawyer.com
WEBSITE www.masscriminallawyer.com

STEPHEN HRONES
JESSICA D. HEDGES

MICHAEL L. TUMPOSKY

PAUL J GARRITY
(ALSO MEMBER OF NEW HAMPSHIRE BAR)

NEW HAMPSHIRE OFFICE:

14 LONDONDERRY ROAD
LONDONDERRY, NEW HAMPSHIRE 03053
TELEPHONE (603) 434-4106
FACSIMILE (603) 437-6472

April 18, 2006

**By Facsimile Only:**
Nancy Frankel Pelletier
Robinson Donovan
F) (413) 785-4658

Re: *Mitchell et al. v. Kennedy et al., C.A. No. 04-40259-FDS*

Dear Attorney Pelletier:

As we discussed on the phone, I have rescheduled the Kennedy deposition for 12:00 P.M. tomorrow at the Catuogno offices in Worcester.

Regarding outstanding discovery, the medical records which you have in your possession are, for all intents and purposes, the only medical records that exist. I have been unable to obtain any additional records so I can only assume that there are none to be obtained.

As far as the addresses of the eyewitnesses, we agree to call only those witnesses at trial for which you currently have an address, including those provided to you at the deposition of Dorothy Mitchell.

You are also in possession of several eyewitness statements. To the extent you do not have any of the plaintiffs' statements, I decline to produce them on the grounds of attorney-client privilege, as they were written by the plaintiffs and delivered to me.

Finally, you have indicated that the following discovery response would be supplemented in the future:

19. Any and all Leominster Police Department personnel and disciplinary records for the officers named in the complaint.

Please provide this information as soon as possible, certainly no later a week than before summary judgment motions are due. Thank you for your cooperation in this matter.

Sincerely,

Michael Tumposky