UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-40259-FDS

ANDRE MITCHELL and DOROTHY MITCHELL,
Plaintiffs

vs.

OFFICER AARON KENNEDY, OFFICER ROBERT QUIRK, OFFICER DAVID SPADAFORE, SERGEANT MARK AMICO, SERGEANT DENNIS SURRETTE and the TOWN OF LEOMINSTER,
Defendants

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO FED. R. CIV. P. 56.1**

NOW COME the defendants, Officer Aaron Kennedy, Officer Robert Quirk, Officer David Spadafore, Sergeant Mark Amico, Sergeant Dennis Surrette, and the Town of Leominster, and, solely for the purposes of the instant motion, hereby state the following undisputed material facts pursuant to Federal Rule of Civil Procedure 56.1:

1. On May 17, 2002, Aaron F. Kennedy was a patrolman for the City of Leominster. (Deposition of Aaron F. Kennedy, April 19, 2006, attached hereto as Exhibit A (hereinafter "Exhibit A"), at 12-13).

2. On May 17, 2002, Officer Kennedy was on car patrol and worked from 3:00 p.m. to 11:00 p.m. (Exhibit A at 13).

3.      During the night of May 17, 2002, Officer Kennedy Officer Kennedy was dispatched to respond to an emergency situation occurring on Adams Street in Leominster, Massachusetts, by a group of males.  (Exhibit A at 14-16).

4.      Officer Kennedy was informed by a dispatcher that a 911 caller had reported an Asian male being beaten up against the side of a car by a group of males.  (Exhibit A at 16).

5.      When dispatched to Adams Street, Officer Kennedy requested a better address for the location at issue.  (Exhibit A at 16).

6.      Officer Kennedy was told that from Wyman's Liquor Mart he was to take a right from Pleasant Street onto Adams Street and that the incident was reported as occuring three to four houses down on the left.  (Exhibit A at 16).

7.      Officer Kennedy followed those directions.  (Exhibit A at 16).

8.      84 Adams Street is three or four houses from the intersection of Adams Street and Pleasant Street.  (Exhibit A at 16).

9.      When Officer Kennedy turned onto Adams Street from Pleasant Street, the first thing he observed was a group of people huddled up against a car.  (Exhibit A at 17.  See Deposition of Andre Mitchell, December 12, 2005, attached hereto as Exhibit B (hereinafter "Exhibit B") at 88-91).

10.     Officer Kennedy was the first police officer to arrive at the scene.  (Exhibit A at 15; 41).

11.     Other members of the Leominster Police Department also responded to the scene.  (Exhibit A at 39).

12.    It was too dark out for Officer Kennedy to determine how many people were present or if there was an Asian male present. (Exhibit A at 17).

13.    Officer Kennedy could not tell what the people grouped against the car were doing. (Exhibit A at 17).

14.    Officer Kennedy parked his vehicle and approached the group to inquire "what was going on." (Exhibit A at 18).

15.    Officer Kennedy observed the plaintiff, Andre Mitchell, move away from the parked vehicle and towards the front of the vehicle. (Exhibit A at 18).

16.    Officer Kennedy then asked Andre Mitchell what was going on. (Exhibit A at 18; Exhibit B at 90, 95).

17.    Andre Mitchell did not stop to respond to Officer Kennedy's inquiry. (Exhibit B at 68-69; 96).

18.    Andre Mitchell then entered 84 Adams Street. (Exhibit B at 68-69; 96).

19.    Officer Kennedy followed Andre Mitchell into 84 Adams Street and eventually placed him under arrest.[1] (See generally, Exhibit B at 69-70).

20.    Officer Kennedy was the first police officer to enter 84 Adams Street on the night of May 17, 2002. (Deposition of Dorothy Mitchell, March 29, 2006, attached hereto as Exhibit C (hereinafter "Exhibit C"), at 36-37; 40; 51).

21.    Officer Kennedy was the arresting officer and the only officer who used force while inside of 84 Adams Street. (Exhibit B at 76; Exhibit C at 36; 40).

---

[1] The circumstances surrounding Officer Kennedy's entry into 84 Adams Street and Andre Mitchell's arrest by Officer Kennedy are subject to dispute and are not the subject of the instant motion. Defendant, Aaron Kennedy, reserves the right to present a defense based on the doctrine of qualified immunity and all other such defenses at trial.

22.     Officer Quirk followed Officer Kennedy into 84 Adams Street and assisted Officer Kennedy in escorting plaintiff, Andre Mitchell, out of the house.  (Exhibit A at 40-41).

23.     During the period of time that police officers were inside of 84 Adams Street the situation inside the house was chaotic.  (Exhibit C at 45).   Dorothy Mitchell was able to move about freely, converse with third parties, and was able to check Andre Mitchell's back pocket to determine whether or not it contained his wallet.  (Exhibit C at 44-48).

24.     Officer Kennedy received eighteen weeks of training at the police academy beginning in April of 1995.  (Exhibit A at 7).

25.     While at the police academy, Officer Kennedy received training in arrest procedures and probable cause.  (Exhibit A at 7-9).

26.     Officer Kennedy received training on the Leominster Police Department's Use of Force Policy at the police academy.  (Exhibit A at 30-31).

27.     Officer Kennedy is familiar with Leominster Police Department policies and procedures, including the Department's Use of Force Policy.  (Exhibit A at 30-32).

28.     Officer Kennedy also received training on search warrants and searches in general at the police academy.  (Exhibit A at 47).

29.     Officer Kennedy does not recall ever having been the subject of a citizen complaint.  (Exhibit A at 12).

30.     Plaintiffs did not make a complaint to the Leominster Police Department as a result of the events of May 17, 2002.  (Exhibit B at 34-37; Exhibit C at 30-33).

31.     Plaintiffs did bring a criminal complaint against Officer Kennedy which was dismissed due to insufficient evidence.  Documents relevant to this complaint are attached hereto as Exhibit D (herinafter "Exhibit D").

32. Captain Bisol of the Leominster Police Department investigates civilian complaints against Leominster police officers. (Exhibit A at 9-11).

33. As of May 17, 2002, Andre Mitchell resided at 129 Adams Street, Leominster, Massachusetts. (Exhibit B at 7).

THE DEFENDANTS
OFFICER AARON KENNEDY,
OFFICER ROBERT QUIRK,
OFFICER DAVID SPADAFORE,
SERGEANT MARK AMICO,
SERGEANT DENNIS SURRETTE and the
TOWN OF LEOMINSTER

By /s/ *Nancy Frankel Pelletier*
Nancy Frankel Pelletier, Esq., of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301 Fax (413) 785-4658
BBO No.: 544402
npelletier@robinson-donovan.com

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this _____ day of September, 2006.

/s/ *Nancy Frankel Pelletier*
Nancy Frankel Pelletier, Esq.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No.: 04-40259-FDS

*********************************************

ANDRE MITCHELL and DOROTHY MITCHELL, *
Plaintiffs *
vs. *
OFFICER AARON KENNEDY, OFFICER ROBERT QUIRK, *
OFFICER DAVID SPADAFORE, SERGEANT MARK AMICO, *
SERGEANT DENNIS SURRETTE and the *
TOWN OF LEOMINSTER, *
Defendants *

*********************************************

DEPOSITION OF: AARON F. KENNEDY

CATUOGNO COURT REPORTING SERVICES

446 Main Street

Worcester, Massachusetts

April 19, 2006 12:01 p.m.

Elisabeth Zahariadis

Certified Shorthand Reporter

AARON KENNEDY
April 19, 2006

Page 6

Q. How long have you lived there?
MS. PELLETIER: You can tell him that.
THE WITNESS: One year.
Q. (By Mr. Tumposky) Prior to that, what town did you live in?
A. Leominster.
Q. Did you live in Leominster at the time of this incident?
A. I've moved a few times. I'll say no.
Q. Are you still employed with the Leominster Police Department?
A. Yes.
Q. You are not required to live in the town in order to work for them?
A. Initially, yes, but then you are allowed to move 15 miles outside of the city.
Q. How long have you worked for the Leominster Police Department?
A. It will be 11 years next week.
Q. What's your current position?
A. Patrolman.
Q. Was that the position that you

Page 7

started at?
A. Yes.
Q. What did you do before you joined the Leominster Police Department?
A. I was an EMT for Patriot Ambulance.
Q. How long did you work there?
A. Two to two and a half years.
Q. Before that?
A. Market Basket grocery store.
Q. Prior to that?
A. I worked for a courier service, it was called Snap.
Q. How far back are we now?
A. I think I had one more job. I worked at Market Basket two times. I was probably like 18 by then maybe.
Q. Where did you go to high school?
A. Leominster High.
Q. What year did you enter the police academy?
A. April of '95.
Q. How long were you there?
A. 18 weeks.
Q. Did you receive training on arrest

Page 8

procedures while you were at the police academy?
A. Yes.
Q. What did they tell you about when you have grounds to arrest without a warrant?
MS. PELLETIER: Objection. It's an extraordinarily broad question, but to the extent you can recall.
Q. (By Mr. Tumposky) Can you explain how they defined the term probable cause to you while you were at the police academy?
MS. PELLETIER: Objection.
THE WITNESS: The way I interpreted it?
Q. (By Mr. Tumposky) The way it was defined to you.
A. I don't recall.
Q. What's your definition?
A. If it fills the element of the crime, you can make an arrest. If it's a felon.
Q. Is it based on your own subjective point of view or how is it characterized, if you know?
MS. PELLETIER: Objection. Other than what you've just testified, if you can

Page 9

explain it any further, go ahead.
THE WITNESS: Depending on the crime that I'm investigating and if the elements are filled through what the law says and if I have the right to arrest or not, that's how I interpret it. Some are arrestable, some are not.
Q. (By Mr. Tumposky) What type of offenses are arrestable?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: From what I know, all felonies, some misdemeanors.
Q. (By Mr. Tumposky) Have you had any complaints brought against you by a citizen?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: I don't recall.
Q. (By Mr. Tumposky) You don't recall if you've ever had any?
A. No, I don't recall having a supervisor with an actual complaint.
Q. Is there internal affairs department in Leominster?

3 (Pages 6 to 9)

CATUOGNO COURT REPORTING SERVICES
Springfield, MA Worcester, MA Boston, MA Lawrence, MA Providence, RI

Page 10

A. There's a captain that handles it.
Q. Who's that?
A. Captain Bisol.
Q. How do you spell that?
A. B-I-S-O-L.
Q. Is he the only officer that handles internal affairs complaints?
MS. PELLETIER: Are you talking about presently?
Q. (By Mr Tumposky) Currently.
A. Currently. When a complaint comes in, they would give it to a sergeant, then will handle it according to his policy, then it would go up the chain, I believe.
Q. Who's above Captain Bisol?
A. The chief.
Q. So it's just him and the chief?
A. Yeah.
Q. Who is the chief now?
A. Roddy.
Q. R-O-D-D-Y?
A. Yes.
Q. He was the chief at the time of this incident in May of 2002?

Page 11

A. Yes.
Q. Was Captain Bisol in charge of internal affairs in May of 2002?
A. Yes.
Q. You are sure that you haven't had any complaints against you because Captain Bisol never told you that you had any?
A. No one has ever come to me.
Q. That would be the only way that you would find out if a complaint had been made against you?
A. Yeah.
Q. Do you know if any other officers who have had any complaints against them?
MS. PELLETIER: Just yes or no.
THE WITNESS: Yes.
Q. (By Mr. Tumposky) Are you aware of any of the other defendants in this case that have had complaints against them?
MS. PELLETIER: Yes or no.
THE WITNESS: I don't know.
MS. PELLETIER: That would be a third option.

Page 12

(Interruption)

MR. TUMPOSKY: Off the record.

(Off record discussion)

MR. TUMPOSKY: We're back on.
Q. (By Mr. Tumposky) Have you ever been disciplined --
A. No.
Q. -- during your time in Leominster?
A. No.
Q. Nothing, not even written up or anything?
A. Nothing.
Q. Have you ever received any accommodations while you were a member of the Leominster Police force?
A. No.
Q. Do they give those out?
A. I haven't seen any.
Q. If I could just turn your attention to the day in question. We're talking about May 17, 2002.

Page 13

Do you remember what you were doing that day?
A. Yes, I was a patrolman for the City of Leominster.
Q. As your duties as a patrolman, what areas of the city were you referring to?
A. I'm assigned to Beat 5 which is kind of like the southwest part of Leominster, I believe.
Q. Is that car patrol or are you on foot?
A. Car patrol.
Q. Do you recall what hours you worked that day?
A. 3:00 to 11:00.
Q. Do you recall being dispatched to Adams Street at any point during that shift?
A. Yes.
Q. Do you recall what time that was?
A. It was at night, I don't remember the exact time.
Q. Was it dark out?
A. Yes.
Q. What did the dispatcher tell you

about what was going on at Adams Street?
A. I was already on another call and I was asked if I could clear it and I said only if it was an emergency.
Q. What did the dispatcher say to that?
A. Then you need to clear it to respond to this call.
Q. Because the dispatcher thought it was an emergency?
A. Yes.
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: Sorry.
MR. TUMPOSKY: She's objecting for the record.
THE WITNESS: Yes.
MS. PELLETIER: I've instructed him to wait for my instructions.
Q. (By Mr. Tumposky) So the dispatcher thought it was an emergency?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: Yes.

Q. (By Mr. Tumposky) About how long after you received the call did you arrive on Adams Street?
A. Couple of minutes.
Q. How far away were you distancewise?
A. Couple hundred yards.
Q. Were you the closest officer?
A. Yes.
Q. Were you the first to arrive on the scene?
A. Yes.
Q. Do you recall -- strike that, please.
At what particular address were you dispatched to?
MS. PELLETIER: Objection.
THE WITNESS: I wasn't given an exact address.
Q. (By Mr. Tumposky) The dispatcher just said go to Adams Street and see what's going on?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: It was a little bit

more defined.
Q. (By Mr. Tumposky) Can you clarify as to how it was defined?
A. When I was told to dispatch, I asked him for a better address for my location. They told me from Wyman's Liquor Mart to take a right from Pleasant Street onto Adams Street and three to four houses down on the left.
Q. Did you follow those directions?
A. Yes.
Q. How many houses down from the corner is 84 Adams Street?
A. Three or four. There's a business there that's broken up in the beginning.
Q. Did the dispatcher tell you anything else as to what was going on?
A. They told me that there was a Asian male being assaulted by three or four individuals up against a car.
Q. Any description given of these individuals?
A. No, I don't recall.
Q. Any description of the motor vehicle?

A. No.
Q. When you turned down Adams Street off of Pleasant Street, what was the first thing you observed?
A. A group of people up against the car.
Q. How many people?
A. I couldn't tell, it was too many, it was dark out.
Q. More than four?
A. Yes.
Q. Were any of them Asian?
A. I didn't see an Asian.
Q. Were there any other people on the street besides that group of people you just identified?
A. I couldn't see through the darkness.
Q. What were these people doing?
A. I couldn't tell.
Q. Was anyone fighting?
A. I couldn't tell.
Q. Did you hear any yelling?
A. Not when I was in my cruiser.

Page 18

Q. What about when you got out?
A. No, I couldn't hear anything.
Q. Did anybody sound agitated at all?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: I really couldn't tell.
Q. (By Mr. Tumposky) What observations did you make about the behavior of the people that you saw?
A. After I exited the car, I walked up to the car to inquire what was going on.
Q. Did anyone speak to you?
A. No, not really.
Q. What was the first thing that someone said to you after you got out of the car?
A. I took notice to Andre Mitchell who had moved away from the vehicle around the front. And I observed what I thought was him attempting to hide something around this area of his abdomen. So I inquired to Andre what was going on.
Q. You knew Andre on a first-name

Page 19

[illegible]

Page 20

[illegible] could have been [illegible] when it happened.
Q. (By Mr. Tumposky) [illegible] you thought he was trying to conceal [illegible] in his abdomen area, do you [illegible] what that could have been [illegible]
MS. PELLETIER: Objection.
THE WITNESS: I speculated [illegible] could have been [illegible]
Q. (By Mr. Tumposky) [illegible] you do [illegible]
A. [illegible]
Q. Okay.
A. [illegible]
Q. [illegible] movement [illegible] ed

Page 21

next?
A. He went around the front of the vehicle [illegible] the car was [illegible] on the wrong [illegible] He went up on the sidewalk and [illegible] I'm not going [illegible] not going [illegible]
Q. [illegible]
A. Yes.
Q. [illegible] sure about that?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: [illegible]
Q. (By Mr. Tumposky) What did you interpret that statement to mean?
A. [illegible] trying to talk to him. I wasn't sure [illegible] he really [illegible] by it.
Q. You didn't think [illegible] afraid of going to jail [illegible]
[illegible] was a [illegible] that.
Q. (By Mr. Tumposky) After he made [illegible] what happened next?

Page 30

THE WITNESS: I believe he was.
Q. (By Mr. Tumposky) You are not saying that he was attempting to assault you by breaking from your grasp?
A. I'm not sure what his thinking was at that time and why he was pulling away other than he didn't comply with my orders.
Q. At this point you decided that the only thing you could do is take out your pepper spray?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: After he broke away, I sprayed him with my capsun.
Q. (By Mr. Tumposky) Are you familiar with the Leominster Police Department policies and procedures?
A. I believe I am.
Q. Are you familiar with the Leominster Police Department use of force policy?
A. I believe I am.
Q. You received training on that at the police academy?

Page 31

MS. PELLETIER: Objection.
THE WITNESS: Yes.
Q. (By Mr. Tumposky) How many days if you recall were devoted to the use of force policy?
A. I believe in the academy it was broken up for different levels, capsun was one day, baton, and then of course the firearms. I don't recall the amount of days or what was covered.
Q. Are you familiar with the use of force continuum as it's defined in the policy?
A. Yes.
Q. At what level along the use of force continuum would pepper spray, or capsun as you call it, what level along the continuum would that be?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: I believe it's number three.
Q. (By Mr. Tumposky) So it's after what other methods of force?
MS. PELLETIER: Objection. Go

Page 32

ahead.
THE WITNESS: Verbal command, hands on, pepper spray.
Q. (By Mr. Tumposky) What about take down or control hold?
A. Hands on.
Q. Did you try any take down or control holds with Mr. Mitchell?
A. I tried to take hold of him, but he resisted.
Q. At that point you felt it was reasonable to use your pepper spray to subdue him?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: Yes.
Q. (By Mr. Tumposky) What other factors are you supposed to take into consideration before using your pepper spray?
MS. PELLETIER: Objection. Go ahead.
Q. (By Mr. Tumposky) Other than the conduct of the suspect?
MS. PELLETIER: Objection. Go

Page 33

[illegible]

Page 38

[illegible] ground with their hands behind the back?

MS. PELLETIER: Objection.

THE WITNESS: That's correct.

Q. (By Mr. Tumposky) Their initial reaction isn't to start flailing about because [illegible] pain?

THE [illegible]: Some people fight [illegible]

Q. (By [illegible] Tumposky) But some people [illegible]

[illegible] officers were in the

Page 39

house besides you and Officer Quirk?

A. I believe it was just me and Officer Quirk.

Q. What other officers had responded to the scene?

A. I noticed outside the residence afterwards maybe three. I think we only had five guys on the street.

Q. Do you recall who they were?

A. Sergeant Shrett was the sergeant on. Officer Jesse Moralis, he's no longer employed by our department. And Officer Amico, who is now Sergeant Amico, transported Mr. Mitchell.

Q. When did Moralis leave?

A. I want to say two years ago.

Q. Do you know why he left?

A. I think from what I heard he moved on to better employment, he works for the government now.

Q. What about David Spadafore?

A. I don't remember seeing him there. He does work for us.

Q. You don't think he was there that

Page 40

day?

A. Could have been. We were only five guys on that night. There's a possibility that he could have drove by or been there, but I didn't see him.

Q. You said Amico was there?

A. Yes.

Q. Where was Quirk in relationship to you inside the house?

MS. PELLETIER: When?

Q. (By Mr. Tumposky) At the time of the arrest.

A. He came in after the capsun as I was handcuffing him.

Q. At the time you went into the house, how many other officers were in the street?

MS. PELLETIER: Objection. On the scene?

Q. (By Mr. Tumposky) On the street.

MS. PELLETIER: On the street meaning working the street or Adams Street?

Q. (By Mr. Tumposky) Adams Street.

A. Me and Officer Quirk were

Page 41

dispatched to the Adams Street address.

Q. At the time you went in, yourself and Officer Quirk were in front of the house?

A. I was there first, he showed up, we were together on a call around the corner. I got there first and he showed up.

Q. At the time you went into the house, was Officer Quirk on Adams Street?

A. Probably not yet.

Q. The first time you saw him was as you were dragging Mr. Mitchell out of the house?

MS. PELLETIER: Objection.

THE WITNESS: Officer Quirk helped me assist Mr. Mitchell to his feet. We did not drag him like you say.

Q. (By Mr. Tumposky) The first time you saw Officer Quirk was as you escorted Mr. Mitchell out of his house?

MS. PELLETIER: Objection.

THE WITNESS: Officer Quirk, when I noticed Officer Quirk was when I was on the ground with Mr. Mitchell and he helped Mr. Mitchell to his feet and then we walked him out of the house.

Page 48

[illegible] be
[illegible] me you
[illegible]
sup[illegible]
inv[illegible]
[illegible]

Page 47

question you about this incident?
A. No.
Q. You had no reason to think that you had done anything improper?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: That's correct.
Q. (By Mr. Tumposky) When you were at the police academy, did you receive training on search warrants and searches in general?
A. I believe it was covered.
Q. How many days were spent covering the proper procedures for searching the house?
A. I don't recall.
Q. Do you know that there are certain guidelines of when you are allowed to enter someone's house?
MS. PELLETIER: Objection. Go ahead.
THE WITNESS: That's correct.
Q. (By Mr. Tumposky) You know that normally you would need a warrant or some particular exception to that, right?
MS. PELLETIER: Objection. Go

[illegible]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No. 04-40259BDS

ANDRE MITCHELL and DOROTHY MITCHELL
Plaintiffs
vs.

OFFICER AARON KENNEDY, OFFICER ROBERT QUIRK, OFICER DAVID SPADAFORE, SERGEANT MARK AMICO, SERGEANT DENNIS SURRETTE and the TOWN OF LEOMINSTER
Defendants

DEPOSITION OF: ANDRE MITCHELL, taken before ROXANNE C. COSTIGAN, Notary Public Stenographer, pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, at the offices of ROBINSON DONOVAN, P.C., 1500 Main Street, Suite 1600, Springfield, Massachusetts on December 12, 2005.

APPEARANCES: (See Page 2)

Roxanne C. Costigan
Registered Merit Reporter

APPEARANCES:

FOR THE PLAINTIFFS:

HRONES, GARRITY & HEDGES LLP
Lewis Wharf - Bay 232
Boston, MA 02110-3927
617-227-3240
BY: MICHAEL L. TUMPOSKY, ESQ.

FOR THE DEFENDANTS:

ROBINSON DONOVAN, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
413-732-2301
BY: NANCY FRANKEL PELLETIER, ESQ.

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECRO |
|---|---|---|---|---|
| Andre Mitchell | 4 | | | |

| EXHIBITS | PAGE: |
|---|---|
| Exhibit 1, Automatic Disclosure............. | 9 |
| Exhibit 2, photograph........................ | 13 |
| Exhibit 3, photographs....................... | 100 |
| Exhibit 4, photographs....................... | 104 |
| Exhibit 5, photographs....................... | 105 |

STIPULATIONS

It is agreed by and between the parties that all objections, except objections as to the form of the questions, and all motions to strike unresponsive answers are reserved and may be raised at the time of trial for the first time.

It is further agreed by and between the parties that the sealing of the original deposition transcript and notification to all parties of the receipt of the original deposition transcript is hereby waived.

ANDRE MITCHELL, Deponent, having been satisfactorily identified by the production of his driver's license and having been first duly sworn by the Notary Public, deposes and says as follows:

DIRECT EXAMINATION BY MS. PELLETIER:

Q. Sir, can you state your name and present residential address for the record, please?

A. **Yes. My name is Andre Omar Mitchell. I'm staying at 15 Lyndel Avenue, Fitchburg, Mass.**

Q. With whom do you reside at that address?

A. **I stay with a friend.**

Q. [illegible]
A. [illegible] friend's name is [illegible]
Q. [illegible] apartment [illegible]
[illegible]
[illegible]
Q. [illegible]
[illegible]
[illegible] 347 [illegible]
[illegible]
Q. [illegible]
A. Yes, I do.
Q. [illegible] situation [illegible] you [illegible] in [illegible] home or [illegible] the [illegible]
A. No. It's -- I [illegible]
Q. [illegible] that [illegible] [illegible]?
A. No. 347.
Q. [illegible] Street [illegible]
A. [illegible] correct.
Q. [illegible] did you [illegible] there?
A. I stayed there with [illegible] girlfriend of mine.
Q. What was her name?
A. Sarah Edmund.

Q. How long did you live there?
A. Well, I stayed there for maybe [illegible] year.
Q. So, would [illegible] prior to the [illegible] have [illegible] living with [illegible]?
A. What was that?
Q. Is that --
A. Yes. Yes.
Q. [illegible] been [illegible] about [illegible] month?
A. [illegible] Right.
Q. [illegible] before that, you were with this girlfriend?
A. That is correct.
Q. For [illegible]?
A. That is correct.
Q. Which puts us back in 2004, beginning of 2004?
A. Somewhere in there, yeah.
Q. Where did you live before that?
A. 129 Adams Street. That's when the whole incident took place, that's where I was staying.
Q. In Leominster?
A. That is correct.

Q. The incident that we are here to discuss today occurred on May 17, 2002, is that correct?
A. **That is correct.**
Q. As of May 17, 2002, you were residing at 129 Adams Street?
A. **That is correct.**
[illegible]
[illegible]
[illegible] 2002 [illegible] I stayed there [illegible] years.
Q. [illegible] you live with there?
A. [illegible] name was [illegible]
Q. [illegible]?
A. [illegible] -- yeah. She goes by [illegible] Right.
Q. [illegible]
A. [illegible] She's -- she passed [illegible] of 2002, who [illegible]
[illegible]
[illegible] father
[illegible] mother
[illegible] father. Dorothy Mitchell [illegible] my mother
[illegible] brothers.
[illegible] your brothers' names

[illegible] brothers' names are Antwon Mitchell and Sean Mitchell.
Q. Were there any children of either Antwon or John or any [illegible] there at the [illegible]?
A. [illegible] and [illegible]
Q. [illegible] there?
A. [illegible] doesn't have no kids. My brother [illegible] which [illegible] Antwon.
Q. And [illegible]
A. Right. That's his nickname around Leominster.
Q. The [illegible] is John [illegible] Sean?
A. Sean. Sean.
Q. Who is Tyla Gon[illegible]?
A. What was that?
Q. Tyla, T-Y-L-A, Gon[illegible]
A. Tyla [illegible]
Q. You [illegible] as a [illegible] knowledge of [illegible] to this [illegible] have --
A. [illegible]
Q. [illegible] that was presented to [illegible]
A. [illegible]

[illegible] they were [illegible] with the [illegible]
[illegible] paperwork [illegible] to fill out more paperwork [illegible]
MS. PELLETIER: [illegible]
[illegible] in the [illegible] some close [illegible] have those [illegible] I'm not [illegible]
Q. (By Ms. Pelletier) [illegible] your [illegible] copies of whatever [illegible]
A. Yes. And [illegible] of those documents [illegible]

Q. Right now with her?
A. **Yes.**
Q. Okay.
MS. PELLETIER: Counsel, can we take a break and have you go look at those documents?
MR. TUMPOSKY: Sure.
MS. PELLETIER: And see if she'll give them to me. Off the record.
(A recess was taken)
MS. PELLETIER: Back on the record. Counsel and Mr. Mitchell were kind enough to go speak to Ms. Mitchell and I've been advised that the only documents she has with her today relate to the May 17 incident and that there's no Internal Affairs complaint or other documents relating to the incident other than those which have been produced in automatic disclosure. Is that accurate, counsel?
MR. TUMPOSKY: To the -- on information and belief, that's accurate.
MS. PELLETIER: Well, at a break, I'm going to ask again that you review the documents that Ms. Mitchell has, and if there

are documents that are different from or in addition to those produced in automatic disclosure, that they be produced to me today unless you're going to object to that for some reason.
MR. TUMPOSKY: Right.
MS. PELLETIER: Okay.
MR. TUMPOSKY: That's fine.
Q. (By Ms. Pelletier) Mr. Mitchell, I understood you earlier to tell me that you got some single line document from the Town of Leominster in connection with this incident. Did I misunderstand that?
A. **No.**
Q. So, you received a document from the Town of Leominster that has a single line on it that says what?
A. **That if we want to take the Complaint up to take it up with the Attorney General, I think it was, yeah, something like that, Attorney General.**
Q. By complaint, what are you referring to?
A. **The Complaint towards Officer Kennedy with the assault, how he vandalized my mom's door how he assaulted my nephew, two and a half, he wa**

**two and a half years old at the time.**
Q. But are you talking about a complaint that you made verbally to a sergeant at the police department or something that you submitted in writing?
A. **We submitted it in writing.**
Q. Do you have a copy of that?
A. **Not with me.**
MS. PELLETIER: Counsel, I would ask that that document also be produced.
Q. (By Ms. Pelletier) Let me see if I can clarify this. You attempted to pursue criminal charges against at least some of the Leominster officers, is that correct?
A. **Yes.**
Q. Is that different from what you're describing right now?
A. **What do you mean?**
Q. The documents that you are referring to?
A. **Yes.**
Q. The complaint that you made and then this document that you got back from the Leominster Police Department?
A. **Okay.**

37

Q. Are those documents in connection with your efforts to pursue a criminal complaint against the officers or something else?
A. **No. It's, yes, in connection to the criminal complaint towards the officers, towards Officer Kennedy.**
Q. Only Officer Kennedy?
A. **Yes. Because he was supposedly -- he was the arresting officer at the time. He was the arresting officer but he didn't -- after the whole incident happened on May 17, he put me in another police cruiser. I don't even know the other officer's name that transported me to the station.**
Q. Did you make any effort to pursue the matter further after you received this one line document from the Leominster Police Department?
A. **Yes.**
Q. What did you do?
A. **I tried to get ahold of the civil laborers union board in Worcester.**
Q. The civil labor union board?
A. **Yes. The ACLU.**
Q. American Civil Liberties Union?
A. **Yes.**

38

Q. What do you mean you tried to get ahold of them?
A. **Well, we got ahold of them.**
Q. Okay.
A. **We talked to them.**
Q. And what happened?
A. **Well, they said once everything is done with the criminal case, they wanted to hear how it turned out because they felt as though -- they -- they knew my rights had been violated and they wanted to know how everything turned out for my best interests.**
Q. Did you go down there in person or did you --
A. **Yes.**
Q. You did?
A. **Yes, me and my mom went.**
Q. Can you tell me the name of the person to whom you spoke?
A. **I can't.**
Q. Did you take any notes, did they give you any pieces of paper?
A. **Yes. My mom should have -- she has that. She knows about all that stuff. My mom keeps**

[illegible] of that stuff.
MS. [illegible]
[illegible]
MR. [illegible]: Okay.
[illegible]
busy [illegible] this -- [illegible] the case.
[illegible]
case?

[illegible]
Civil Liber[illegible] Union?
[illegible]
[illegible] attorney
[illegible]
Q. [illegible] accent
A. Okay. That Attorney [illegible]
[illegible] those are the two cultur[illegible]
on that criminal case.
Q. Attorney wh[illegible]?
A. [illegible]
Q. [illegible]
A. Yes. He is the one that, where the case [illegible], he got it dismissed.
Where is he located?
A. Haverhill, I [illegible].
Q. Is he in with Mr. [illegible]?

[illegible] for the possession, when you were [illegible]

[illegible] middle.

[illegible]

A. In the middle of 2001 and 2002.

Q. [illegible] these harassing incidents occurred and before the arrest in 2002, is that right?

A. Could you repeat that again?

Q. After you were arrested in 2001?

A. [illegible]

Q. For the possession charge, and before the arrest in May of 2002 is when these incidents occurred?

A. Yes. [illegible] there was a [illegible] before the [illegible]

A. Yeah. Yeah. Pretty much. [illegible] the position that I have is [illegible] months [illegible]

[illegible] Fitchburg [illegible] school [illegible] my business [illegible] Fitchburg.

Q. [illegible] individuals --

A. No, I haven't.

Q. [illegible]

A. [illegible]

Q. Did you ever speak to any of the individuals that you went to high school with [illegible] Fitchburg Police office [illegible] the Leominster Police Department?

A. No, I haven't.

Q. Did you have encounters with the law when you were a juvenile; did you have any problems with [illegible] when you were a juvenile?

A. No.

Q. Were you ever taken into custody when you were a juvenile?

A. **Maybe one time for -- I was really young at the time. For stealing, I think it was. Very young. Young and just trying to hang in with the in-crowd.**

Q. Why don't you tell me in your own words what you claim happened on May 17, 2002?

A. **Okay. On May 17, 2002, I was at a family gathering at my mom's house. There was a lot of family members. It was a nice spring day, spring night. You know, we was having a good time.**

Q. Was it a particular event; was it somebody's birthday or what were you doing there?

A. **No. We were just having a nice family gathering. That's all.**

Q. Okay. Go ahead.

A. **And I was outside, me and a couple friends, couple witnesses to this incident. And maybe my nephews. And I seen two cop cars pull up and they had their fog lights on. And when I seen that, I knew something -- nothing good could come out of that. And before that, I mean, I was going to enter into my mom's home anyways. So, I entered into**

the home, started to enter into the home, and Officer Kennedy, he got out. He was like, Andre, where are you going? And I just looked and I was, like, and I kept walking into my mom's house.

So, as I walked in, I walked in and I turned -- not turned around but went through the living room, into the kitchen area, and in doing so, I heard a loud bang. And then I heard like keys jingling, like, you know, the sound of like keys jingling. And when I looked up, it was Officer Kennedy. He came in and I was surprised to see him enter my mom's home like that. He threw me down. He cuffed me. Got me up. And then he maced me. And me and my mom, well, I was -- I was -- I was -- I kept asking him, I said -- it all happened so quick and it was like, I was like, I said, why are you arresting me? And he said, don't worry about it. He goes, I'll tell you later. And then my mom, she came in, and she was -- I mean, everybody in the house was frantic after that. Because we was trying to figure out why, you know, why this happened, you know. It was a family gathering. I had my nephews, my cousins, brothers, friends of the family. I mean, it was -- it was a packed house. And he never explained

why he arrested me. Then my mom came in, she had -- she asked him, she goes, what -- what are you guys doing in my house, she goes, and what are you doing to my son? And he was like, ma'am, don't worry about it. We'll tell you later. And to this day, she still hasn't got no information from them why they did that.

When he arrested me, he -- and cuffed me, he went into my back pocket. I had a wallet. I had a wallet and I had probably maybe, I'd say, two to $250 on me, and my wallet ended up missing. So, I had no I.D. I had no social security. I had no money. Nor did I have my wallet. And I had all kinds of, I mean, when he maced me, pepper sprayed me, he was maybe less than a foot away, I want to say, because when he sprayed, he got me more on my right -- in my right eye, and he got me in my mouth, and I couldn't breathe but this eye wasn't hurting. It was mainly this eye. And I mean, I mean, I couldn't rub, nor could I see, but I know that when he transported me, I mean, it was -- it was -- of course it was going to be chaos in the house because a lot of the family members and friends, you know, they cared a lot about me and they was worried about

[illegible] why I [illegible] being arrested [illegible] [illegible] [illegible] [illegible] all I can say is, he goes [illegible] going to try and get to the bottom [illegible] and I looked at him [illegible] he goes [illegible] getting you for assault and battery on a [illegible] like, assault and battery? I said, [illegible] said, if anything I got assaulted. And he [illegible] well, he's getting you for [illegible] goes, it's bogus. Supposedly [illegible] mom's house [illegible] to my [illegible] house and I [illegible] living room [illegible] and I [illegible] keys, [illegible] goes, [illegible] for bail, [illegible] thinking, you know, he goes, you know, [illegible] assault [illegible] disorderly [illegible]

said, how much is bail? I'm thinking, you [illegible] two, maybe three grand. He's [illegible] I was like, you know, I was [illegible] $15. But I was -- in the back [illegible] thinking why is bail so cheap [illegible] they didn't even tell -- they didn't [illegible] why I was being arrested. And [illegible] I guess after that happened, it was a [illegible] street. I mean, the place was [illegible] was people came [illegible] all over, and [illegible] totally embarrassed, [illegible] embarrassed. I was [illegible] I was scared, because I don't know [illegible] what they was going to do to me. They [illegible] and they had [illegible] like six or seven cops around me. And they was just [illegible] Andre, you like beating up on people? I'm thinking [illegible] know; I said, ain't nothing going [illegible] this. I mean, it's six cops around [illegible] chair. I'm mad. My eye's burning. I [illegible] breathe, and they're not telling me, you [illegible] why I'm being arrested. So, I didn't think I [illegible] going to get out [illegible] was going to [illegible] [illegible]

[illegible] gone, nor [illegible] if you tell [illegible] have been [illegible] rights have [illegible] complaint. So, that's what we did. And afterwards, I [illegible] I didn't get out of the Leominster Police Department, I want to say, [illegible] night [illegible] girlfriend at the time that [illegible] 125 Adams Street, because I went [illegible] mom's house and she's the one that [illegible] bailed me out and she couldn't believe, you know, the swelling of my eyes and how everything happened. [illegible] everybody [illegible] go to the hospital because they used so much [illegible] spray, I [illegible] kids running [illegible] my nephew [illegible] the front yard, wh[illegible] [illegible]

76

did hear a lot of -- I mean, you know, a lot of the people in the house, of course, you're going to hear a lot of screaming, a lot of chaos, because they're still, everybody's still trying to figure out, you know, why that happened.

So, after that happened, I mean, I don't know exactly what officer talked to my [illegible] that to her about, you know, I didn't [illegible] to go in there, nor did any other officer [illegible] you want to complain. So, that's what [illegible] filled out a complaint the next morning. [illegible] went to my girlfriend's house that night. [illegible] mean, I felt -- I felt pain in my whole bo[illegible] [illegible]

Q. Who is it that you allege actually placed you under arrest?

A. **Officer Kennedy. He did, but he didn't transport me.**

Q. Who is it that you allege sprayed your eyes?

A. **Officer Kennedy.**

Q. Why is it that you have brought a

complaint against officer Robert Quirk?

A. **That was the other officer that was with him in the house.**

Q. What did he do?

A. **What was that?**

Q. What did he do to you?

A. **He was in the house at the time.**

Q. Other than being present in the house, what do you allege Officer Robert Quirk did to violate any of your rights?

A. **Besides him being partners with Officer Kennedy, that was it, just them two just being -- I mean, when it happened, I mean, it was an ugly scene.**

Q. Upon what facts do you base your claim that Officer David Spadafore violated any of your rights?

A. **They all was present at the time.**

Q. So, other than that he might have been present and in your mother's house?

A. **Right.**

Q. You don't have any facts upon which to base --

A. **No.**

Q. -- any claims against Officer David

Spadafore, correct?

A. **That's correct.**

Q. Upon what facts do you base your claim against Mark Amico, Sergeant Mark Amico?

A. **Excuse me. Can I have a moment with counsel, please?**

Q. Can you answer the question first and then you can have as much time as you'd like?

A. **Yes.**

Q. Can you answer the question first? As a general rule, if there's a question on the table --

A. **Okay.**

Q. -- the deponent answers and then you can take a break.

A. **Okay. Okay.**

Q. Can you answer the question that's before you?

A. **Okay. Repeat the question, please.**

Q. Would you mind?

A. **He was just present. They did -- they -- didn't assault me. Officer Kennedy, he was, I mean, he assaulted me. He vandalized my mom's home.**

Q. You're talking about Officer Kennedy?

A. **Yes.**

Q. I'm only asking you right now about Sergeant Mike Amico.

A. **Okay.**

Q. Other than your allegation that he was present in the home, you don't have any facts upon which to base any claims against Sergeant Mark Amico, correct?

A. **Correct.**

[illegible]

[illegible]

Q. (By Ms. Pelletier) Can you tell me what facts if any you have within your possession that support your claim against Sergeant Dennis Surrette?

A. **No.**

Q. Do you know who Dennis Surrette is?

A. **Is he a sergeant?**

Q. According to your complaint.

A. **Yes.**

Q. You do not have any facts within your

possession presently to support a claim against Sergeant Dennis Surrette, is that correct?

A. **Correct.**

Q. Was he present at the house?

A. **I'm not sure.**

Q. Did you actually see Officer --

A. **I wasn't --**

Q. I'm sorry. Go ahead.

A. **Go ahead.**

Q. Did you actually see Officer Robert Quirk present inside your mother's home on May 17, 2002?

A. **I really didn't see too much. I was maced. I couldn't keep my eyes open.**

Q. Did you ever see Officer Robert Quirk inside the home on that day?

A. **Yes. I know he was there. Yes.**

Q. Did you see Officer Quirk?

A. **Yes.**

Q. Did you see Officer Spadafore?

A. **No, I don't remember.**

Q. Did you see Sergeant --

A. **I heard voices. I couldn't really see because of the pepper spray.**

Q. Did anybody identify themselves as being

Officer Spadafore in your mother's home that day?

A. **Maybe to my mother.**

Q. Not to you?

A. **At that time, like I told you, I couldn't really see. I was pepper sprayed and I was booked.**

Q. You said you could hear. My question, sir, is did you hear anybody identify themselves as being Officer David Spadafore?

A. **No, I did not.**

Q. Did you see Sergeant Mark Amico?

A. **I can't recall.**

Q. Did you hear anybody identify themselves as being Sergeant Mark Amico?

A. **No.**

Q. Did you see Sergeant Dennis Surrette?

A. **I know that he was present. I really couldn't see.**

Q. How do you know he was present?

A. **Because they're on the police report, the names.**

Q. Is that the only basis upon which you have brought the claims against Officer David Spadafore, Sergeant Mark Amico and Sergeant Dennis Surrette, because their names are on a police report?

A. **I really couldn't see because of the pepper spray. They didn't identify -- I mean, a cop, he's not just going to identify himself. They didn't even tell me why I was being arrested.**

Q. Okay. I'm going to ask for you to listen to my questions and try to answer the questions. Is the only reason you've brought a claim against Officer David Spadafore, Sergeant Mark Amico and Sergeant Dennis Surrette is because their name is identified on the police report or do you have any other facts in your possession upon which to base your claims against those particular officers?

A. **My mom.**

Q. What about your mom?

A. **She explained which cops was in her house.**

Q. What did she explain to you?

A. **She explained that they was in there and that they shouldn't have been in there, they had no right to be in there. So, she's putting a complaint out for them.**

Q. So, she told you that all of those officers that I've just identified were in her house that day?

A. **Yes.**

Q. So, there was five police officers present?

A. **Yes.**

Q. Your mother has a separate Complaint from you, you understand that, your mother has made a separate complaint for whatever she claims happened to her than the Complaint that you've made with regard to what happened to you, do you understand that?

A. **Yes.**

Q. Are you making claims against each of the officers that I have identified?

MR. TUMPOSKY: Objection. You can answer. You can answer.

THE WITNESS: No.

Q. (By Ms. Pelletier) Which officers are you making claims against?

A. **Against Officer Aaron Kennedy.**

Q. So, it's your testimony today, sir, that the only officer against whom you are pursuing a claim is Officer Aaron Kennedy, is that correct?

MR. TUMPOSKY: Can we go off the record for a second?

MS. PELLETIER: No. I'd like him to answer the question.

MR. TUMPOSKY: Well, he can answer the question and then we'll go off the record.

Q. (By Ms. Pelletier) Can you answer that question, sir?

A. **Could you repeat the question?**

Q. It's your testimony today that the only officer against whom you are pursuing a claim is Officer Aaron Kennedy, is that correct, of the officers that I named?

A. **That is correct.**

MR. TUMPOSKY: Now can we go off the record?

MS. PELLETIER: Yes.

(Off record conference)

MS. PELLETIER: Back on the record.

MR. TUMPOSKY: Just for the record, Mr. Mitchell may not be aware of certain legal [illegible] which officers [illegible] the [illegible] other individual officers.

Q. (By Ms. Pelletier) Do you know the

[illegible] person [illegible]
[illegible] went to the police station?

A. No, I did not.

Q. [illegible]

[illegible]

A. [illegible] I told them [illegible]

[illegible] apartment.

Q. Were there any persons of Asian descent present at this family gathering that day?

A. No, there wasn't.

Q. You were advised at some point that you were allegedly involved in an incident involving an Asian male, is that correct?

A. That is correct.

Q. [illegible]

A. **At the police station.**

Q. What if any information do you have about [illegible]?

A. **[illegible] There wasn't none.**

[illegible] Asian male [illegible]

[illegible]

A. **There wasn't no incident.**

Q. Well, there wasn't an incident that you were involved in according to you, correct?

A. **That is correct.**

Q. [illegible] there was a call [illegible] was placed to the Leominster Police Department regarding three individuals allegedly attacking an Asian male, correct?

[illegible]

Q. Do you have any reason to believe that that phone call never was made or that that was a bogus call or anything like that?

A. **Yes.**

Q. What [illegible] --

A. **I believe it was a bogus call.**

Q. You believe that some member of the public in [illegible] made a bogus call to the Leominster Police Department?

A. **Well, if they made a phone call, they was [illegible]**

[illegible]

Q. Your attorney in the criminal matter got [illegible]

[illegible] and listened to the tape [illegible]

A. Okay.

Q. Were there three [illegible]

A. Yes.

Q. Did you [illegible]

A. [illegible]

[illegible]

[illegible]

[illegible] an Asian male?

A. Yes.

Q. And that the individual gave the general description of [illegible] incident was occurring, correct?

A. Correct.

Q. And that's why the police officers were looking for somebody who was allegedly beating up an Asian male, correct?

A. Correct, but --

Q. This wasn't out of left field?

A. Okay, but on the tape, they [illegible] there was three kids. I'm a grown man [illegible]

Q. You'd agree with [illegible]

[illegible] responding to [illegible]?

A. **Yes.**

Q. Your testimony is you were minding your own business outside of your mother's house and these officers pulled up in the cruisers and that's when you went into the house, correct?

A. **Right.**

Q. Who were you outside with?

A. **Couple family members.**

Q. Who?

A. **My nephew which was Sean Mitchell, Sean -- not my brother, my nephew.**

Q. How old is he?

A. **He is, I want to say, twenty-two, twenty-three.**

Q. Who else?

A. **Jiliel Stevenson, she's on the paper, the paperwork.**

Q. What's your relationship to her?

A. **A friend.**

Q. Who else?

A. **Joe Hines, cousin. Antwon Mitchell, brother.**

Q. Anybody else?

A. **I think that's all the people that was**

**outside. I think it was like five. Four or five of us outside.**

Q. What were you doing outside?

A. **Just to go outside instead of being inside with everybody, just -- it was a nice day, nice night, just with went outside. Went out -- we went out to talk to the friends. They went out to smoke a cigarette, smoke cigarettes.**

Q. Where were you all positioned outside of the house?

A. **Out in front.**

Q. There's no deck or porch or anything, right?

A. **That is correct.**

Q. It's just the sidewalk and on the side of the house is a driveway?

A. **Correct.**

Q. So, where were you?

A. **Out in front.**

Q. On the sidewalk?

A. **(Indicating)**

Q. You have to answer --

A. **Yes.**

Q. Go ahead.

A. **Yes.**

Q. How about the four other individuals, where were they?

A. **Same place.**

Q. So, you were just standing on the walk?

A. **Yes.**

Q. The police officers, two cruisers came up, correct?

A. **Yes.**

Q. You were minding your own business hanging out while they were smoking cigarettes, but when the police came, you just decided to go into the house?

A. **Well, I decided to go into the house before that happened. I was just walking up, walking, and then I noticed that they had the fog lights on, and I mean, to me, it was -- it wasn't going to be a good situation.**

Q. Why is that?

A. **Because, for one, they were just pulling up with the fog lights on and they're moving -- they were -- they -- how they came up and then when they -- when he got out, he was like, Andre, where you going. I mean, it was no -- there was no reason**

**to me for any of that.**

Q. How about your brother Antwon, what did he do?

A. **Yes. What?**

Q. What did he do?

A. **He was there. I don't -- I mean, I think he started -- he was walking towards the house t[illegible] I'm not sure.**

Q. He has had some trouble with the law before, correct?

A. **Who, Antwon?**

Q. Yes.

A. **I'm not sure, not that I know of.**

Q. Your brother Antwon has not had trouble? I thought you told me both of them had been incarcerated, only one?

A. **I'm talking about my other brother. I got three brothers.**

Q. Three brothers. I only have two, Antwon, who is also known as Jamie, and Sean?

A. **Right. Because my other brother wasn't there. He was in prison at the time.**

Q. Well, earlier when I asked about your family members, you only identified the two brothers.

[illegible] present. [illegible] brother's name?

A. [illegible]

Q. [illegible]

A. [illegible]

Q. [illegible]

A. [illegible]

Q. [illegible]

A. [illegible]

[illegible]

Q. [illegible]

A. For assault on his girlf[illegible] and

[illegible]

A. I'm not sure.

Q. [illegible] he ever live [illegible] Street?

A. Yes.

Q. Has he been incarcerat[illegible] other occasion[illegible]

A. Yes.

Q. For what?

A. I mean, I really don't [illegible] his rap record[illegible]

Q. Earlier you told me that [illegible] that [illegible] one of [illegible] Police

[illegible]

A. [illegible] that I [illegible] of.

Q. [illegible] there [illegible] brother [illegible]

A. [illegible] three [illegible] Three brothers, [illegible] sister.

Q. [illegible] have sis[illegible]s?

A. [illegible]

Q. [illegible]

A. [illegible] kitchen. [illegible] because [illegible] got married.

Q. [illegible] the [illegible] name?

A. [illegible]

Q. [illegible] you spell [illegible]

A. [illegible] I think that['s] how you spell it.

[illegible]

Q. [illegible] Jackie have any problems [illegible] the Leo[minster] [illegible] Department?

A. [illegible]

A. [illegible] either [illegible]

Q. [illegible] others that [illegible] Sean, [illegible]

A. [illegible]

Q. [illegible] that the Leo[minster] [illegible] Police Department [illegible] or just you?

A. [illegible]

Q. [illegible] ever [illegible] that [illegible] by the Leo[minster] [illegible] Departm[ent] [illegible]

A. [illegible]

Q. [illegible] Ja[illegible] or [illegible], were they harassed

A. [illegible]

Q. [illegible] you,

A. No. No. I [illegible]

Q. Oh, Sean's the [illegible]

A. Right. She just [illegible]

Q. Jiliel Stevenson, Joe Hines and Antwon are outside, you turned to go in but you can't tell me where physically Antwon is at that time, correct?

**A. Yeah. I'm pretty sure he was -- he was -- Antwon, I think he was with us in that gro outside.**

Q. I understand that, but when you went to turn to go in?

**A. Right.**

Q. There's a small area to walk into the house, right?

**A. Right.**

Q. Where were the other individuals?

**A. Outside.**

Q. On the sidewalk?

**A. Yes.**

Q. Then the police officers pull up and you began to go into the house?

**A. Right.**

Q. And they said, Andre, hey, where are you going, that was Officer Kennedy?

**A. Right.**

Q. And you turned around and shut the door, is that right?

**A. No. I turned around and I was, like, what are you talking about? So, I kept walking in**

Q. And you shut the door?

**A. Yes.**

Q. In the face of the police officer?

**A. No. He wasn't even in -- around me at the time.**

Q. Did you shut the door then?

**A. Yes, I did.**

Q. So, then you entered inside the house, and where did you go?

**A. I went towards my kitchen area, toward the back. I was going to grab something to eat.**

Q. Just ignore the situation outside?

**A. Yeah.**

Q. Just going to go get something to eat?

**A. I mean, what was the situation?**

Q. I don't know.

**A. All he had to do --**

Q. Two police cruisers outside the door, right?

**A. Mm-hmm.**

Q. You left your brother, your nephew and two other individuals outside, walked in, shut the

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANDRE MITCHELL AND DOROTHY MITCHELL )
VS. ) 04-4025-9BDS
OFFICER AARON KENNEDY, OFFICER ROBERT )
QUIRK, OFFICER DAVID SPADAFORE, )
SERGEANT MARK AMICO, SERGEANT DENNIS )
SURRETTE AND THE TOWN OF LEOMINSTER )

DEPOSITION OF DOROTHY MITCHELL, taken at the request of the defendant pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure before Deborah A. Normandin, a Notary Public in and for the Commonwealth of Massachusetts, on March 28, 2006, commencing at 11:00 a.m. at the offices of Robinson, Donovan, P.C., 1500 Main Street, Springfield, Massachusetts.

APPEARANCES:

FOR THE PLAINTIFF:
HRONES, GARRITY & HEDGES, LLP
Lewis Wharf-Bay 232
Boston, MA 02110-3927
BY: JESSICA HEDGES, ESQ.

FOR THE DEFENDANT:
ROBINSON, DONOVAN, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
BY: NANCY FRANKEL PELLETIER, ESQ.

ACCURATE COURT REPORTING
1500 MAIN STREET, SPRINGFIELD, MASSACHUSETTS
(413) 747-1806

APPEARANCES:

INDEX

DEPONENT: DOROTHY MITCHELL

| | PAGE |
|---|---|
| EXAMINATION BY MS. PELLETIER: | 3 |
| EXAMINATION BY MS. HEDGES: | 111 |

EXHIBITS

| NUMBER | | PAGE |
|---|---|---|
| 1 | LETTER | 12 |
| 2 | STATEMENTS | 100 |

DOROTHY MITCHELL, SWORN

Having been satisfactorily identified by the production of her driver's license, and duly sworn was examined and testified as follows:

EXAMINATION BY MS. PELLETIER:

Q. Miss Mitchell, have you ever had your deposition taken before?
A. Yes, I have.
Q. Under what circumstances?
A. Well, I have a lawsuit going on now.
Q. You have another lawsuit going on now?
A. I have one going on, yes, I do.
Q. Where is that? What court is it in, do you know?
A. It's in Worcester.
Q. I'm sorry?
A. Worcester.
Q. Is it in Federal Court or Superior Court?
A. I just know I go to Worcester Court, that's all. I mean I've only been once in my life so.
Q. What is it related to?
A. A truck driver hitting my car.
Q. So it's a car accident?
A. Yes.

Q. When did that accident occur?
A. This is 1996.
Q. Are you represented by counsel in that case?
A. Yes, I am.
Q. Who's your counsel?
A. Dombrosky in Leominster, D-O-M.
Q. D-I-M?
A. No, D-O-M-B-R-O-S-K-Y and he's in Leominster.
Q. I'll give you another reader's digest version of the rules since you've had your deposition taken before but I'm going to ask you a series of questions and the stenographer is going to take down the questions and answers which you'll be giving me under oath. If I ask you a question that you don't understand, please tell me and I'll try to rephrase it so that you understand it.
A. Uh-huh.
Q. I need you to answer verbally rather than by saying uh-huh or huh-huh because if you do that, we won't know what you meant when we get the transcript back.
A. Okay.
Q. If you wouldn't mind waiting before I complete a question before you begin answering, I'd appreciate it because the stenographer can't take down two people speaking at the same time. If you need to take a

went through first, and when we filed, when I filed my complaint because my complaint was against Leominster Police Department, they told me I couldn't do that. I had to put specific police officers on the complaint; so what I did is I went to my car and got my, the police report and logged all the police officers that were on the police report, that's how we filed that; and when we did that, the Civil Liberties Union, we really wanted to get them involved in Worcester, but they just took the paperwork that we had filed and what they said is the only involvement they would get into is when Andre finished the case in Leominster. They would not get a lawyer to help him with his case in Leominster, but after that case was over, we could come back to them and they would help us with the civil complaint; but Andre decided he didn't want to go with them, that's why I'm saying there was no documents.

Q. What about the Attorney General's Office, page 35?

A. I, I think we called them, yes, we did call them.

Q. You called them?

A. Yes, we did call them.

Q. What about the police department itself, did you go down and submit a complaint in writing to the police department?

A. No.

MS. HEDGES: Again, Counsel, Page 36 of Andre's deposition, We submitted the claim in writing, I do not have it with me. I asked for that document to be produced. Miss Mitchell is now telling me they didn't submit any such claim in writing, is that correct?

A. Not to the police department, we went through the courts. Everything we did went through the courts.

Q. The question I asked your son was, But are you talking about a complaint that you made verbally to a sergeant at the police department or something you submitted in writing? His answer was, We submitted it in writing.

A. Because he's talking about all the court documents, all the court papers we went through. We went through the Assistant District Attorney. We went through the District Attorney. We went through the, we asked to see a Judge. We were denied. I mean we went through everybody that was dealing with the court. We didn't want to go through the police department because the police department is the people you got the complaint against.

MS. PELLETIER: Counsel, I also refer you back to page 33 where he again is advising me that he has documents and he had to fill out paperwork. I asked for the documents. He said first that he gave them to counsel and then, quote, As a matter of fact, my mother has some of those documents.

A. Court documents, not police documents, court.

Q. The only documents that you have, ma'am, that reflect any complaints that you made in connection with the May 17 incident are the complaints that you filed against the officers and then dismissal of those charges, is that right?

A. Dismissal of what charges from who?

Q. Dismissal of the charges that you filed against the Leominster Police Department and the officers?

A. Dismissal, there was no dismissal, the only thing we were getting back which I have documents, we were getting things like this one line sentences, After hearing, after hearing on the above matter, I find insufficient evidence was presented to issue a criminal complaint; and this one was from the Assistant Clerk and then we got one from, I think we were going to the Clerk Magistrate and we asked to see a Judge and we got one back from somebody, from the Clerk Magistrate saying the same thing, always a one line item. We didn't even get it from

the Judge.

Q. Can I see those documents?

MS. PELLETIER: Off the record.

(Discussion held off the record.)

Q. The documents that have just been shown to me by counsel are documents which have been produced in this case. Is it your testimony that you have absolutely no other documents which relate to any complaints by you against any Leominster Police Department?

A. No.

Q. It is your testimony that you have no other complaints, correct?

A. Right.

Q. Do you have any other documents that relate in any way to the incidents on May 17, 2002?

A. No.

Q. You don't have any other documents?

A. No.

Q. There's a document sitting in front of you that says your name on it. What's that?

A. This is my statement of what happened that night.

Q. What is that document for?

A. Excuse me, what was it for? It was what

A. No.

Q. Tell me in your own words to the best of your recollection what happened on May 17th, 2002 at your home.

A. In my own words? I feel like a wrong was done that night. I was relaxing, my little past time what I do best on my computer and I heard this loud bang. I'm upstairs and I know there were a lot of people at the house and I, I really thought it was my nephew and my grandson fooling around because they were always fooling around; and I was always yelling about quit doing that, don't wrestle in my house, don't do this; so I stayed upstairs for a minute and I yelled down to Virginia, What was that noise; and she said, Miss Mitchell, Leominster Police is in the house and they are messing with Dre. I said Dre, in my house, what? So I come downstairs and I come through and I see numerous people in the dining room. The only officer in the house was Officer Kennedy at the time. When I got to the kitchen area and I looked down the hall to my laundry room, I observed Andre in cuffs with his hand behind, he was cuffed with his hands behind his back. He's in cuffs and he has this foamy stuff coming off his face; and I went to him and I heard him say, Mom, my eyes, and I went directly to him. By this time there are other police officers in the house. One is

at the back door and one is standing by the stove in the kitchen; and I went toward him and one of the police officers says to me, I would not get close to him if I were you because, and I said, Why? He said, He's been sprayed, and I lost it. I was like, In my house with my grandkids in here, I don't think so, because my youngest grandson had a breathing problem when he was born and that just really got to me because I don't even allow cigarette smoking in my house. Nobody does any smoking in the house because of that kid; and so I was yelling, yes, of course I was because I was angry, and then I seen him with all this sticky stuff on his face, and the only person there was Officer Kennedy at that point when I first got downstairs; but then other officers started coming in and I kept asking him, Why are you arresting him? Why are you in my house? He says, I will explain it to you. This is now March 28th, 2006. I still have not got an explanation of why they were there, what they were doing there; and when I found out the reason why they were there was from Dre after he got arrested because none of us knew why. Everybody was yelling. It was a lot of chaos going on. The kids are screaming because their eyes were burning. There was so much spray sprayed in the house you could not stay in the house. We had to leave outside,

Q. And the rest of them just happened to be in your living room?

A. They weren't all in my living room.

Q. Where were they?

A. Jaleia Stevens (SIC), Andre, Omar, Sean and Joseph were standing outside by her car because she had, she wanted to smoke a cigarette.

Q. She who?

A. Jaleia Stevens, you can't smoke in my house because of my grandson.

Q. So all of them went outside?

A. They were outside talking with her while she was smoking a cigarette I guess, I don't know.

Q. Where did you get that information?

A. I got that from everybody else that's where they were. When I come downstairs, they were not in the house. They were still outside.

Q. So when you came downstairs originally, the only people in the house were Officer Kennedy, Andre, you and who else?

A. Virginia Gonzalez, her two children, Dana Winters, her three children and Tayla Gonzalez and Jen Zaccarelli.

MS. PELLETIER: Counsel, for the record,

A. When I came through the dining room when I first came downstairs, I said to Virginia because she was there, you have to come through the dining room to get to the kitchen to get anywhere else in that house, and I said to her, What is that smell; and she said, Kennedy just sprayed Dre, Miss Mitchell, and his arms were cuffed. That's what she said to me.

Q. Who said that?

A. Virginia and I said, Are you sure that's what, she goes, That's what I saw, and she was not the only person, I mean it's just hearsay, he say, she say, you know, but that's what I was told.

Q. How come you didn't mention that when you told me the story the first time?

A. Mention what?

Q. This whole conversation that you had with Virginia?

A. You just asked me to tell you exactly what I thought happened. I tried to tell you what I thought happened. You didn't ask me to tell you as I came through word verbatim who I ran into and what I said to them or I would have said it like that. You didn't ask me like that.

Q. Did you talk to anybody else besides Virginia

when you came down the stairs before you went in and saw Andre on the floor?

A. No, Virginia was the only person I talked to.

Q. Where was she?

A. She was in the dining room holding on to her kid who was screaming like he had just --

Q. Who's her kid?

A. Antwon, the one that got hurt.

Q. She didn't say anything about Antwon getting hurt?

A. Well, she was screaming, too. I was screaming. Everybody was screaming. It was crazy because she was like, she was talking to me so fast and saying things.

Q. Did she say anything to you about Antwon being hurt?

A. Yes, I said to her, Why is he crying like that? She said, Well, look at his head, he just got hurt Kennedy just ran up here and hurt him, and I saw this bruise on his head and that's when I just totally lost it, lost it because then I started yelling at the cop, I'm like, Wait a minute, why are you in here? What are you doing? What are you spraying with kids in the house? I, today I'm going to explain it to you, ma'am. This is

March 28th again 2006 and I haven't gotten an explanation yet.

Q. You come down the stairs and is Virginia the first person you run into?

A. Actually, Virginia is the only person I'm trying to see because she lives there like me, nobody else needs to be answering my questions.

Q. That's not the question I asked you. Is Virginia the only person that you ran into when you came down the stairs?

A. No.

Q. Was Virginia the only person that you spoke to?

A. Yes, she is.

Q. Have you told me everything that you said and everything that she said?

A. I don't want to get into what all she was saying.

Q. Well, you need to because I'm asking you.

A. Because she don't, she wasn't being nice, she was swearing a lot.

Q. That's fine.

A. Because she was upset.

Q. I understand that.

A. How she don't know what the F is wrong with these MF's, why they in here, why they hurting her baby, why they even in this house. She was really out of, you know, she was very hurt, very angry and I became very angry.

Q. Did she tell you how it is that her son allegedly got injured?

A. She said, Kennedy ran in the house and ran him over, that's exactly how she said it.

Q. You testified that you saw a bruise on him --

A. Yes, I did.

Q. -- within seconds of the incident occurring?

A. Yes, I did.

Q. Where was it?

A. On his head.

Q. Where?

A. And I think it was on either, I think it's his left side it was on. I'm not sure which side but I know he had a bruise. He had that bruise when he went to the hospital. They asked about the bruise at the hospital.

MS. HEDGES: Nancy, I need to take a break.

(Break in Proceedings.)

Q. You've described a conversation that you had

with Virginia Gonzalez when you came down the stairs and you've also described making some comments when you went into the kitchen --

A. Uh-huh.

Q. -- about what you observed with regard to Andre. Did you have any conversations with anybody else in the house other than those that you've just described?

A. My nephew Joseph Hines, he was, by now everybody basically is in the house because when all the police started running up everybody came in; and he asked me, he said to me, Aunty? I said, What? He said, They can't do this. I said, Don't worry about it. He's like, Aunty, check Dre's pocket and get his wallet because he has a lot of money in his wallet and how I know is because he just got paid for a job he just did; and I said to him that's, I think that's when I really went toward Andre, when I really went up to him because I wanted to see; but he didn't have no wallet in his pocket, his wallet was already gone, and those are the only two people I had contact with, Virginia and Joseph Hines.

Q. Did you have any conversation with Officer Kennedy?

A. Other than asking him, not asking, I was yelling, Why are you in my house? Why are you spraying



51

Q. Were there any officers that you claim that were in your house other than Officer Kennedy and Officer Quirk?
A. There were other ones there.
Q. Who were they?
A. I don't know. They are on the police report. That's the only way I know those names is because they were on that police report. I did not know those police officers.
Q. Who was the first police officer in your home to your knowledge?
A. Officer Kennedy.
Q. And how do you know that?
A. Because he was the only one there when I came downstairs.

52

Q. You have brought suit against five police officers, do you understand that?
A. Yes, I do.
Q. Can you state all the facts upon which you base your claim that Officer Robert Quirk violated any of your rights?
MS. HEDGES: Objection.
Q. You can answer.
A. Yes.
Q. Go ahead.
A. They were in the house. There was no warrant. Why are you there?
Q. Other than what you've just testified to which is Officer Robert Quirk was in your house without a warrant, are there any other facts upon which you claim that Officer Quirk violated any of your rights?
MS. HEDGES: Objection.
A. No.
Q. Can you state all the facts upon which you base your claim that officer David Spadafore violated your rights?
MS. HEDGES: Objection.
A. He was in the house, too.
Q. When was he in the house?

A. The police report put him in there. I don't know why he was in there. I don't even know if he was there. When I went to file my complaint, I couldn't do it against the City of Leominster, the police department. I had to do it against officers individually, so that's who he put on the police report so that's who we are filing against.
Q. Sitting here today do you have any personal knowledge as to whether Officer David Spadafore was present in your home at any time?
A. There were officers in the house but I do not, I do not know who they are.
Q. What do you claim Officer David Spadafore did in your home?
MS. HEDGES: Objection.
A. Just being there, he was just there.
Q. His existence in your home violated your rights?
MS. HEDGES: Objection.
A. Yes.
Q. What rights?
A. There's no warrant, why you there?
Q. So the mere fact that he was present in your home without a warrant is the basis for your claim against

Officer Spadafore?
A. That's correct.
MS. HEDGES: Objection.
Q. That's it?
A. Yup.
Q. But you don't have any idea even of who Officer Spadafore is, correct?
A. Nope.
Q. Can you state all the facts upon which you base your allegation that Sergeant Mark Amico violated your rights?
MS. HEDGES: Objection.
A. Excuse me, say that again, please?
Q. Can you state all the facts upon which you base your allegation that Sergeant Mark Amico violated your rights?
A. You know I'd have to say yes.
Q. Can you state all the facts upon which you base your allegation that Sergeant Mark Amico violated your rights?
A. Yes.
Q. State the facts.
A. Because I was told he was in the house. I didn't see him but outside he stated he was not in my

house.

ledge?

Q. So the only facts upon which you base your claim against Sergeant Mark Amico is the fact that Virginia and her sister told you that he was present in the home?
MS. HEDGES: Objection.
A. Yes.
Q. State all the facts upon which you base your allegation that Sergeant Dennis Surrette violated your civil rights?
MS. HEDGES: Objection.
A. Yes.

Q. Can you state the facts, please?
A. He was in the house.
Q. Did you observe him in the house?
A. Probably, I just didn't know who he was.
Q. Sitting here today you can't describe Officer Surrette?
A. No.
Q. And you can't tell me that you have any personal knowledge that he was present in your home?
A. No.

you

Q. Other than the presence, we already talked about that, other than the mere presence in your home, are there any other facts upon which you base your allegation that any of these officers violated your rights?
MS. HEDGES: Objection.
A. I was never told why you were there, that's a violation.
Q. Of what?
A. Any, my rights.
Q. Your right to what?
MS. HEDGES: Objection, Nancy.
A. My rights, it's a violation of my rights, it's my home.
Q. Identify each officer that you asked what they were doing there by name.
A. Kennedy.
Q. Did you ask any other officer other than Kennedy?
A. No.
Q. Are there any other facts upon which you base your allegation that any of these officers violated your rights?

MS. HEDGES: Objection.
A. No.

taking him? What are you doing? Why are you arresting him? Why are you in here? Right on out the door and all other officers followed but that one outside.

Q. The one outside was Officer Amico?

A. That's what I was told.

Q. I'm a little bit confused. Do you claim that he was or he wasn't in the house at some point?

A. I didn't see him in the house. I was told he was in the house. He told me he was not.

Q. You never saw him there?

A. No, I did not.

Q. So the only reason that he's a party to this case is because somebody told you that he was in the house?

A. The only reason he's a party to the case is because he's, if you look at the police report, he's the officer that's on the police report.

Q. So his name is on the police report?

A. Exactly.

Q. That is the only basis for your naming him as a party to this case?

MS. HEDGES: Objection.

A. Exactly.







FIRST JUSTICE
JOHN J. CURRAN, JR.

JUSTICE
EDWARD J. REYNOLDS

CLERK-MAGISTRATE
PHILIP B. O'TOOLE

ASST. CLERK-MAGISTRATE
RAYMOND J. SALMON, JR.
MICHAEL K. CROTEAU
GLORIA I. CORMIER

# Trial Court of the Commonwealth
## Leominster District Court

25 SCHOOL STREET
LEOMINSTER, MASSACHUSETTS 01453
(978) 537-3722
FAX (978) 537-3970

CHIEF PROBATION OFFICER
GEORGE H. SMITH, JR.

ASST. CHIEF PROBATION OFFICER
DIANNE FASANO

PROBATION OFFICERS
JACK C. COOMBS
DIANE M. FRAZIER
CHRISTOPHER S. KEYES
REBECCA RAMIREZ
THOMAS J. THELIN
(978) 537-3846
FAX (978) 534-1654

July 25, 2002

Officer Aaron Kennedy
c/o George Z. Pucci, Esq.
Kopelmen & Paige, P.C.
31 St. James Ave.
Boston, MA 02116

RE: Clerk-Magistrate Hearing - Andre Mitchell V. Officer Kennedy - A&B, Larceny Over $250.
Dorothy Mitchell V. Leominster Police Dept. - Unlawful Entry
Virginia Gonzalez V. Officer Kennedy - Assault & Battery

Dear Officer Kennedy:

After hearing on the above matter I find insufficient evidence was presented to issue a criminal complaint.

Sincerely,

Michael Croteau
Michael Croteau
Assistant Clerk-Magistrate

cc: Leominster Police Dept.

☐ SUMMONS FOR DEFENDANT
☐ SUMMONS FOR WITNESS

DOCKET NUMBER

Trial Court of Massachusetts
District Court Department

SESSION: ☐ CRIMINAL ☐ JUVENILE ☐ JURY ☒ MAGISTRATE HEARING

NAME, ADDRESS AND ZIP CODE OF DEFENDANT

Officer Aaron Kennedy
Leominster, Police Dept.
29 Church St.
Leominster, MA 01453

NAME AND ADDRESS OF COURT DIVISION

Leominster District Court
25 School Street
Leominster, MA 01453

YOU MUST APPEAR AT THIS COURT ADDRESS ON THE DATE AND TIME SPECIFIED HEREIN

DATE AND TIME OF APPEARANCE

07/18/02 AT 10:00 A. M.
DATE TIME

NAME, ADDRESS AND ZIP CODE OF WITNESS

OFFENSE(S)

assault & battery, larceny over $250.
assault & battery

To the above named ☒ Defendant ☐ Witness:

You are hereby ordered to appear in this Court on the appearance date noted above

☒ To answer to a criminal complaint charging you with the offense(s) listed above.

☐ To give evidence and testify on behalf of the ☐ Commonwealth ☐ Defendant in the matter described above, and to appear from time to time and day to day thereafter as ordered. You are further required to bring with you:

WITNESS: FIRST JUSTICE Hon. John J. Curran | DATE OF ISSUE 07/02/02 | CLERK-MAGISTRATE

## WARNING TO DEFENDANT OR WITNESS:

Failure to appear in accordance with this summons may result in the issuance of a warrant for your arrest. Please bring this document with you to court.

## ATENCION:

Esta es una notificación oficial de la corte.
Si usted no sabe leer inglés, obtenga traducción!

APPLICATION FOR COMPLAINT ☐ JUVENILE

Trial Court of Massachusetts
District Court Department

☐ ARREST ☐ HEARING ☐ SUMMONS ☐ WARRANT

The within named complainant requests that a complaint issue against the within named defendant, charging said defendant with the offense(s) listed below.

COURT DIVISION

Leominster District Court
25 School Street
Leominster, MA 01453

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|---|
| 5/20/02 | 5/17/02 | LEOMINSTER (MY MOTHERS HOUSE) |

NAME OF COMPLAINANT
ANDRE MITCHELL

ADDRESS AND ZIP CODE OF COMPLAINANT
129 ADAMS ST.
LEOMINSTER, MA 01453

NAME, ADDRESS AND ZIP CODE OF DEFENDANT
OFFICER KENNEDY - LEOMINSTER POLICE DEPT.

| NO. | OFFENSE | G.L. Ch. and |
|---|---|---|
| 1. | ASSAULT AND BATTERIE | |
| 2. | ~~THEFT~~ | |
| 3. | LARCENY OVER $250 | |
| 4. | C: 7/18/02 @ 10:00 Am | |

COURT USE ONLY → A hearing upon this complaint application will be held at the above court address on DATE OF HEARING ~~6-28-02~~ AT TIME OF HEARING ~~10:30AM~~ ← COURT USE ONLY

## CASE PARTICULARS — BE SPECIFIC

| NO. | NAME OF VICTIM Owner of property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc. | VALUE OR PROPERTY Over or under $250. | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc. |
|---|---|---|---|---|
| 1 | ANDRE MITCHELL | BLACK WALLET ($250 CASH) | $250 | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

OTHER REMARKS: OFFICER KENNEDY VIOLATED MY CIVIL RIGHTS, BY ENTERING MY MOTHERS HOME WITH NO WARRANT. HE ARRESTED ME, AND MASED ME, WITH NO KNOWLEGE OF MY (INNOCENSE).

X [signature]
SIGNATURE OF COMPLAINANT

## DEFENDANT IDENTIFICATION INFORMATION — Complete data below if known.

| DATE OF BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NUMBER | SEX | RACE | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| OCCUPATION | EMPLOYER/SCHOOL | MOTHER'S NAME (MAIDEN) | FATHER'S NAME |
|---|---|---|---|
| | | | |

## ↓ COURT USE ONLY ↓

| DATE | DISPOSITION | AUTHORIZED BY |
|---|---|---|
| | NO PROCESS TO ISSUE<br>☐ At request of complainant<br>☐ Complainant failed to prosecute<br>☐ Insufficient evidence having been presented | |
| | PROCESS TO ISSUE<br>☐ Sufficient evidence presented<br>☐ Defendant failed to appear<br>TYPE OF PROCESS<br>☐ Warrant<br>☐ Summons returnable ______ | |
| | ☐ Continued to ______ | |

COMMENTS

ATTEST: PHILIP ... CLERK